**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **PENNY L. BAILEY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **CIVIL ACTION 14-0305-WS-N** |
| | ) |
| **BALDWIN COUNTY BOARD OF** | ) |
| **EDUCATION,** | ) |
| | ) |
| **Defendant.** | ) |

**ORDER**

This matter comes before the Court on defendant's Motion for Summary Judgment (doc. 36).  The Motion has been extensively briefed and is now ripe for disposition.[1]

---

[1]       Review of the summary judgment record has been hampered by the parties' inclusion of extraneous matters with their exhibits.  The Local Rules specify that "[i]f discovery materials are germane to any motion or response, only the relevant portions of the materials shall be filed with the motion or response."  Civil L.R. 5(a).  However, plaintiff and, to a lesser extent, defendant have filed complete copies of lengthy transcripts, such as the 204-page deposition transcript of Jennifer Sinclair (doc. 48-5), the 119-page hearing transcript (doc. 37, Exh. A-2), and the 157-page deposition transcript of Penny Bailey (doc. 48-2).  The Court will not scour uncited portions of those exhibits seeking out evidentiary nuggets that might aid one side or the other.  *See* Rule 56(c)(3), Fed.R.Civ.P. (in ruling on summary judgment motion, "[t]he court need consider only the cited materials" in the record); *Allstate Ins. Co. v. Regions Bank*, 2015 WL 4073184, *1 n.1 (S.D. Ala. July 2, 2015) ("The undersigned will not sift through these massive evidentiary submissions searching for uncited factual tidbits that might bolster the position of one side or the other."); *Preis v. Lexington Ins. Co.*, 508 F. Supp.2d 1061, 1068 (S.D. Ala. 2007) ("Parties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions.").  Also, both sides have submitted suggested determinations of undisputed facts (docs. 40 & 44), but the new Local Rules (effective August 1, 2015) delete that requirement and forbid such filings.  *See* Civil L.R. 56(a)-(b) ("No other supporting documents may be filed absent court order.").  In accordance with Civil L.R. 56(a) and (b), those separate statements of fact are not properly filed and will not be considered.

I.      **Relevant Background.**[2]

On the afternoon of January 28, 2013, a small school bus picked up a handful of special-needs children after school in Baldwin County, Alabama to transport them home for the day. Such a routine, workaday occurrence is repeated hundreds of times per year at each of thousands of schools across the country.  But January 28 was different.  The events on that bus, which were captured on videotape, resulted in Penny L. Bailey losing her job with the Baldwin County Board of Education (the "Board"), and ultimately prompted this age discrimination lawsuit.

  A.      *The Events of January 28, 2013.*

The basic facts are not in dispute.  Bailey was employed by the Board as a Licensed Practical Nurse ("LPN") from 2006 until June 13, 2013.  (Bailey Aff. (doc. 48-1), ¶ 2.)  At the time of the incident and personnel decision in question, Bailey was 60 years old.[3]  As of January 2013, Bailey was assigned to Perdido Elementary School, where she performed LPN duties by caring for a single special-needs student during school hours.  (Bailey Aff., ¶ 12.)  Bailey also "was assigned a supplemental bus route to care for a different special needs child on her bus ride in the morning and afternoon."  (*Id.*)  In this capacity, "Bailey was an itinerant nurse and had the responsibility to ride the bus with special education students."  (Lee Aff. (doc. 37, Exh. A), ¶ 3.)  Aside from Bailey, two other Board employees were assigned to that bus: a paraprofessional, 53-year old Tammy Jordan; and a bus driver, 33-year old Karen Johnson.  (Bailey Aff., ¶¶ 14, 27, 28.)

_____

[2]       The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party.  *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Thus, Bailey's evidence is taken as true and all justifiable inferences are drawn in her favor.  Also, federal courts cannot weigh credibility at the summary judgment stage.  *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.").  Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept[s] [Bailey's] version of the facts drawing all justifiable inferences in [her] favor."  *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008).

[3]       The record reflects that Bailey was born in early 1953.  (Bailey Dep. (doc. 48-2), at 13.)  Curiously, however, Bailey avers in an affidavit executed on November 16, 2015 as follows: "I am 63 years of age."  (Bailey Aff., ¶ 1.)  If she was born in early 1953 (as attested in her deposition), then Bailey could not have been 63 years old in November 2015.  The discrepancy is unexplained.

A video/audio recording from a stationary camera mounted inside the bus depicts certain events that occurred during the ride home on the afternoon of January 28, 2013.  (*See* doc. 37, Exh. C.)[4]  The nearly 26-minute recording, which is time-stamped as beginning at 3:30 p.m., is an overhead view of the interior of the bus, looking from the front toward the back.  (*Id.*)[5]  The video camera is positioned in the top center at the front of the bus, slightly above and to the right of the driver's head.  (Ferrell Dep. (doc. 37, Exh. J), at 28-29.)  The only microphone used during the recording is apparently at the front of the bus, where the camera is fixed.  At the beginning of the video, five students are visible[6] on the bus, along with Jordan (the paraprofessional) and Bailey (the LPN).  Although she mostly faces the front of the bus (leaning

---

[4]     Facts clearly depicted in a video recording whose authenticity has not been challenged are accepted for summary judgment purposes, even where they conflict with the plaintiff's narrative.  *See, e.g., Scott v. Harris*, 550 U.S. 372, 380-81, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape."); *Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) ("where an accurate video recording completely and clearly contradicts a party's testimony, that testimony becomes incredible"); *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010) ("Where the video obviously contradicts Plaintiff's version of the facts, we accept the video's depiction instead of Plaintiff's account.").  No question having been raised as to its authenticity or integrity, the bus video is accepted for summary judgment purposes.

[5]     Although not explained in the parties' summary judgment filings, the DVD found at Exhibit C to the Board's evidentiary submission (doc. 37) actually contains two video files, one labeled "20130128_153003_0001.AVI" and the other labeled "20130128_153003.AVI."  The former file was actually recorded later in time on the day of this incident (with a date stamp beginning at 3:55 p.m.).  It does not depict the incident in question (which occurred nearly 20 minutes before that recording commenced) and does not appear to have been referenced or relied upon by the parties in their submissions.  It is not clear why this file is included on the DVD found at Defendant's Exhibit C or what (if any) significance the parties would have the Court glean from its contents.  The latter file, by contrast, does depict the relevant incident and is central to the Motion for Summary Judgment.  Again, it would have been preferable for the parties to confine their evidentiary submissions to materials actually cited in their briefs and related to their summary judgment arguments, rather than including extraneous files and exhibits whose effect is to divert judicial resources away from relevant matters.

[6]     One of those students is a small child seated in the second row on the left, from the camera's perspective.  Because of his diminutive size and location obscured behind another seat, that student is barely visible or (sometimes) not visible at all until he gets off the bus at approximately 3 minutes, 45 seconds into the recording.

into the aisle with her left foot on the floor in the middle of the aisle), Bailey periodically turns her head approximately 90 degrees from her position on the left side in the fourth row for a couple of seconds to check on her assigned student, a female in a wheelchair located on the right side in the very back of the bus, behind the fourth row of seats.  Jordan is seated directly in front of Bailey in the third row on the left.  Because of the position of the camera, the bus driver, Johnson, is not visible in the video; however, she is obviously present given that the recording reflects the bus's movement and stops, and her voice is captured at various times.

One particular student (a boy dubbed "Student 2" in the summary judgment briefs) bears particular significance in this case.  Student 2, who is tethered to his seat via a restraining harness in the second row on the right side of the bus, acts out during the video.  He strains at his harness, stands up, moves erratically, and frequently looks back at Jordan and Bailey while making indistinct noises.[7]  Several times, Jordan gives stern directives to Student 2, denying his requests and telling him to face the front.  At approximately the 6-minute, 30-second mark of the video, a lanky, bespectacled student ("Student 1") seated in the front row on the left side of the bus turns back toward Jordan and Bailey and says something.  The words are indistinguishable; however, both Jordan and Bailey smile, then exchange words.  Within seconds, Student 1 is heard to say, "Can I hit him for real?  I can do it?  I can do it for real?"  There is no audible response from anyone.  Indistinct words and what appear to be knowing glances/smirks are exchanged for approximately 15 seconds, with Bailey demonstratively shrugging her shoulders and smiling, then making what appears to be an excited gesture directed at her assigned student, who also smiles.  At the 7:04 mark, Student 1, still looking back at Jordan and Bailey, says "turn around" and makes a spinning gesture with his left index finger.  Instantly and in unison, Jordan and Bailey turn their heads 180 degrees toward the back of the bus and remain still for approximately eight seconds.  While the adults' gazes are averted, Student 1 stands up, enters the aisle, and punches Student 2 in the jaw.  Only afterwards do Jordan and Bailey turn back around to face the front.  Over the next 30 seconds or so, Student 1 loudly boasts, "I didn't wanna hit him hard," as Student 2 rubs his jaw.  Jordan and Bailey smile, and do not appear concerned or

---

[7]    The audio from the recording is often garbled and difficult to discern while the bus is in motion because engine/road/wind noise overwhelm the speech of the bus's occupants; therefore, Student 2's comments (as well as those of other bus riders) are often unintelligible.

alarmed by such telltale indications of assault.  At approximately the 7:45 mark, Jordan is heard to declare, "I didn't see nothing."  Shortly after the 9-minute mark, a voice off camera (presumably Johnson, the bus driver) states, "I didn't hear nobody holler or nobody squeal."

Neither Jordan nor Bailey checks Student 2 for injuries.  For his part, Student 2 does not cry or exhibit obvious signs of distress; to the contrary, his conduct appears much the same as it had been prior to the incident, although he continues to rub/slap his own jaw for some time.

After the fact, none of the adults on the bus (Bailey, Jordan, Johnson) reported the incident to appropriate Board officials.  (Doc. 37, Exh. A-2, at 29; Ferrell Dep., at 15.)  However, the parents of Student 2 called the Board's Transportation Supervisor, Preston Ferrell, to report that when their child got off the bus that day, he had marks on his face from where he had been struck.  (Ferrell Dep., at 13-14.)  Ferrell pulled the video and watched it with his supervisor, Michael Vivar, the Board's Transportation Coordinator.  (*Id.* at 16.)  Both were "kind of dumbfounded" by what they saw.  (*Id.*)  The Board conducted an investigation.[8]  Upon being confronted with the video, Tammy Jordan (the paraprofessional on the bus) promptly tendered her resignation.  (Lee Aff. (doc. 37), Exh. A), ¶ 8.)[9]  As for Karen Johnson (the bus driver), the Board removed her from the special education bus, placed her on a different bus, and issued her a letter of reprimand, but did not suspend or terminate her employment.  (Ferrell Dep., at 17; Vivar Dep., at 13-16.)[10]  The Board's handling of the incident with respect to Penny Bailey forms the basis of this lawsuit, and must be scrutinized in greater detail.

---

[8]     This investigation included efforts by the Board's Human Resources Director, Jennifer Sinclair, to review the videotape and interview multiple individuals, including Bailey, Jordan, Johnson and others.  (Sinclair Dep. (doc. 37, Exh. D, at 102-03.)  Sinclair then provided the Superintendent, Dr. Lee, with the information thus procured, as well as her investigative findings.  (*Id.* at 33.)

[9]     Defendant's evidence unambiguously reflects that Dr. Lee would have recommended Jordan's termination had she not resigned.  (Lee Aff., ¶ 8.)  For her part, Jordan testified at the hearing that she had done nothing wrong, but that she resigned her employment at the Board because she had been told that she "could not go to the schools at all during this investigation," thereby restricting her ability to go on the school campus where her grandchildren were enrolled.  (Doc. 37, Exh. A-2, at 61-62.)  Jordan also acknowledged, however, that she had "resigned on the spot" when Sinclair had shown her the video.  (*Id.* at 73.)

[10]     That letter of reprimand was written by Vivar and dated February 28, 2013.  (Doc. 37, Exh. A-4.)  In the letter, Vivar explained that he and Ferrell had concluded that "although we (Continued)

**B.     The Board's Decision to Terminate Bailey's Employment.**

During the relevant time period, Alan T. Lee, Ph.D., was the Superintendent of the Baldwin County Board of Education.  (Lee Aff., ¶ 2.)  After reviewing both the videotape and the Board's investigative findings, Dr. Lee made a recommendation that the Board terminate Bailey's employment.  (*Id.*, ¶ 4.)  On March 5, 2013, Dr. Lee sent a letter to Bailey explaining that he was recommending her discharge "on the grounds of neglect of duty, failure to perform your duties in a satisfactory manner, and other good and just cause."  (Doc. 37, Exh. A-1.)  The March 5 letter identified as "facts supporting the proposed termination" the January 28 incident, which Dr. Lee characterized as one in which Bailey "failed to properly supervise students while on [her] afternoon bus route."  (*Id.*)  The March 5 letter proceeded to enumerate these purported failings as follows: "a) You failed to properly respond to a student on your bus who issued a verbal threat to hit another student. b) You knowingly turned your head, at the request of the student making the threat, while another student was hit in the face. c) After learning that a child had been hit by another student, you failed to assess whether or not he was injured or needed medical attention. d) After learning that a child had been hit by another student, you failed to report the incident to administration."  (*Id.*)

Bailey exercised her right to a hearing before the Board to challenge Dr. Lee's recommendation.  (Lee Aff., ¶ 5.)  A public hearing was held on June 13, 2013, before the Board, with both sides being represented by counsel and having an opportunity to make statements and arguments, examine witnesses and introduce exhibits.  At the outset of the hearing, Dr. Lee's counsel succinctly laid out the case for termination in the following terms:

> "The video shows, we submit, that Ms. Bailey intentionally and knowingly turned her head 180 degrees and held it there for eight seconds to knowingly ignore

---

cannot see you in the video, you should have been able to hear and see what was going on just a couple of feet behind you, on a bus with very few students.  As the driver, your lack of action, helped to contribute negatively to this incident."  (*Id.*)  The letter concluded that Johnson was being transferred to a different bus and that "future incidents similar to this could result in further disciplinary action."  (*Id.*)  The letter of reprimand and ensuing transfer of Johnson were performed by the Board's Transportation Office independently of HR Director Sinclair's investigation.  (Sinclair Dep., at 134.)  Ferrell testified that, in his view, "we didn't have enough evidence to recommend termination" of Johnson because the evidence did not prove Johnson's knowledge of what was transpiring during the punching incident.  (Ferrell Dep., at 29.)

> [Student 2] being punched in the face.  She did nothing to stop this from
> happening.  Instead, she turned a blind eye.  She did nothing to help him after it
> happened, despite the fact that she's a licensed nurse.  She did nothing to report
> what happened despite being a board employee.  Because she did nothing,
> because she turned a blind eye, we submit that she does not deserve to keep her
> job."

(Doc. 37, Exh. A-2, at 12-13.)  In his hearing testimony, Dr. Lee explained the reasoning for his

termination recommendation and his observations from review of the bus video in the following

terms:

> "[I]f you listen carefully, if you watch that segment enough times, he says, Turn
> around.  And watching both heads of both adults who had responsibility to take
> care of children turn their heads and look out the back, lower part of that bus and
> simply ignore what they suspected or should have known was going on, that flies
> in the face of everything we are as a school district if we allow that to happen.
>
> *          *          *
>
> "It appeared to me that the two adults who were visible to you, knowing that our
> school board prohibits any kind of corporal punishment, were colluding to allow a
> child to be their disciplinarian.  And watching the expressions on the faces and
> almost the appearance of feeling like they had done something that certainly
> shouldn't have happened but they had accomplished it in a way that they weren't
> going to be held accountable was very distasteful to me.  And I don't think it's
> behavior that we can tolerate from any employee."

(*Id.* at 24-25.)

A contested issue during the June 13 hearing was the differential treatment of Bailey

(whose termination Dr. Lee had recommended) and the much younger bus driver, Johnson (who

was disciplined for the incident, but faced neither suspension nor termination).  Dr. Lee testified

that, while "the bus driver is in charge of the bus," he "would not expect the bus driver to be

observing the children" in the circumstances presented here.  (*Id.* at 31-32.)  As Dr. Lee put it,

"My intent would be to have the driver focus entirely on driving, as they should be able to

assume that two adults would be able to manage the behavior of five children."  (*Id.* at 32.)[11]  Dr.

---

[11]      Dr. Lee's assessment of the bus driver's duties was bolstered by the testimony of
HR Director Jennifer Sinclair, who concurred that Johnson's "primary responsibility is to drive
the bus."  (Sinclair Dep., at 131.)  Sinclair further opined that Bailey "has a responsibility to
address an issue when a student's safety is affected."  (*Id.* at 137.)  According to Sinclair, "[I]f
there was a threat that a student was going to hit another student and two adults are on the bus,
and one of them fails to respond, then the other adult[] does not sit there and watch it.  They
would have an obligation to respond to ensure the safety of the students."  (*Id.* at 140.)

Lee amplified this rationale in his summary judgment affidavit, wherein he averred that (i) "Ms. Bailey's job was fundamentally different than that of the bus driver;" (ii) "[t]he bus driver's primary responsibility was to drive the bus," not chaperone or oversee the minute-by-minute behavior of passengers; (iii) "[i]t would be reasonable for the bus driver to assume the other adults were properly supervising the students;" (iv) "the video did not show the bus driver and her culpability was unclear;" (v) the video did not disprove Johnson's insistence that she neither heard Student 1 threaten to strike Student 2 nor observed the incident; and (vi) Bailey and Johnson were ultimately dissimilar because "[t]he bus driver was tasked with driving and she never agreed to turn her head to allow a student to punch another student in the face who was tethered to the seat.  Ms. Bailey did." (Lee Aff., ¶ 7.)[12]

Bailey testified in her own behalf at the Board hearing.  She denied having heard Student 1 threaten to hit Student 2, denied having seen Student 1 gesture for Bailey and Jordan to turn around, and explained that she had turned her head at the precise moment of Student 1's directive because her assigned student had "made noises" and Bailey needed to make sure she was not having a seizure.  (Doc. 37, Exh. A-2, at 87-89.)  As for the allegation that she had intentionally turned her head to allow Student 1 to punch Student 2 in the face, Bailey testified, "No.  I mean, it may look like that, but that's not what happened.  I swear.  I would not do that. … That does look like that, but that's not what happened."  (Id. at 108.)[13]

---

[12]      Bailey called Johnson as a witness at the hearing.  Johnson testified that she "honestly didn't know" what had happened on the bus on the afternoon of January 28 until she asked her supervisor to pull the videotape.  (Doc. 37, Exh. A-2 at 49-50.)  Johnson further testified that Student 2 and Bailey had a history of contentions interactions on the bus, that their "relationship was not pretty" and that "[w]e had to keep them separated."  (Id. at 55.)

[13]      In her summary judgment affidavit, Bailey largely reiterated her testimony from the hearing.  Notably, Bailey acknowledged in the affidavit that "I watched the video tape of the hitting incident and admit it looks like I turned around at Student 1's direction."  (Bailey Aff. (doc. 48-1), ¶ 21.)  Nonetheless, Bailey insists that her actions were entirely coincidental, that she never heard nor understood Student 1's instruction and gesture to turn around, and that she turned her head at the critical instant because the student to whom she was assigned "had made a loud sound."  (Id., ¶¶ 21, 26.)  During a deposition in this case, Bailey conceded that she and Jordan had turned around simultaneously with Student 1 directing and motioning them to turn around; however, she testified that this happened "[c]oincidentally."  (Bailey Dep., at 114.)  As Bailey put it, "I turned around at the same time he does that.  But the tape and my angle are totally different things."  (Id.)

At the conclusion of the hearing, the Board voted by a margin of four to two to uphold Superintendent Lee's recommendation and terminate Bailey's employment.  (*Id.* at 117-18.)  The position was subsequently filled by a 54-year old female named Deborah Watson.  (Doc. 37, Exh. F, at 2.)  Bailey then filed suit against the Board, alleging a single cause of action for violation of the Age Discrimination in Employment Act.  In particular, Bailey alleged in her pleading that "Defendant's decision to terminate Plaintiff constitutes an intent to discriminate on the basis of her age."  (Doc. 1, ¶ 35.)  A key allegation buttressing Bailey's ADEA claim in her pleading was that "Karen Johnson, a substantially younger bus driver, was accused of similar allegations resulting from the same incident.  Johnson was not terminated and/or suspended for her alleged participation in the alleged inappropriate conduct."  (*Id.*, ¶ 26.)

## II.   Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent.  *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004).  Rather, "the

summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale." *Id.* at 1086 (citation omitted); *see also Williamson v. Clarke County Dep't of Human Resources*, 834 F. Supp.2d 1310, 1318 (S.D. Ala. 2011) (recognizing and applying rule that summary judgment standard is applied equally in employment discrimination cases as in other kinds of federal actions).[14]

### III.   Analysis.

#### A.   *Analytical Framework and Burden of Proof.*

As noted, Bailey's lone cause of action asserts that the Board's decision to fire her violated the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.* ("ADEA").  "The ADEA prohibits employers from discharging an employee who is at least 40 years of age because of that employee's age." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1331 (11th Cir. 2013).  Indeed, by its express terms, the ADEA provides that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  In 2009, the Supreme Court clarified the statute's application by explaining that "under § 623(a)(1), the plaintiff retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action." *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 177, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009).  Thus, to prevail on an AEDA claim, "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision."  557 U.S. at 177-78; *see also Liebman v. Metropolitan Life Ins. Co.*, --- F.3d ----, 2015 WL 9259224, *2 (11th Cir. Dec. 18, 2015) ("To assert an action under the ADEA, an

---

[14]     In light of these and numerous other authorities, the Court cannot endorse Bailey's assertion that "[i]n general, summary judgment is an inappropriate tool for resolving claims of employment discrimination."  (Doc. 45, at 2.)  Such a contention is irreconcilable with binding Circuit precedent. *See, e.g., Chapman v. AI Transport*, 229 F.3d 1012, 1025 (11th Cir. 2000) (recognizing that approximately 60% of employment discrimination cases are resolved on summary judgment, opining that "trial courts should not treat discrimination differently from other ultimate questions of fact," and concluding that "[t]he long and short of it is that the summary judgment rule applies in job discrimination cases just as in other cases") (citations omitted).

employee must establish that his age was the 'but-for' cause of the adverse employment action.").

Where, as here, the plaintiff relies on circumstantial evidence to satisfy her burden of persuasion, the Eleventh Circuit has "continued to evaluate ADEA claims based on circumstantial evidence under the *McDonnell Douglas* framework." *Sims*, 704 F.3d at 1332; *see also Kragor v. Takeda Pharmaceuticals America, Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (when an ADEA claim "is based on circumstantial evidence, we analyze the allocation of burdens and the presentation of proof under the framework articulated in *McDonnell Douglas Corp. v. Green*"). "Under this framework, a plaintiff must first establish a *prima facie* case of discrimination." *Sims*, 704 F.3d at 1332. "To make out a *prima facie* case of age discrimination, the plaintiff must show four things: (1) that she was a member of the protected group of persons between the ages of forty and seventy; (2) that she was subject to adverse employment action; (3) that a substantially younger person filled the position … from which she was discharged; and (4) that she was qualified to do the job…." *Kragor*, 702 F.3d at 1308 (citation and internal quotation marks omitted); *see also King v Adtran, Inc.*, --- Fed.Appx. ----, 2015 WL 5194899, *1 (11th Cir. Sept. 8, 2015) ("In a traditional age discrimination case, the plaintiff may establish a *prima facie* case under the ADEA by showing that: (1) he was a member of the protected age group, (2) he was qualified for his position, (3) he suffered an adverse employment action, and (4) he was replaced by a younger individual.") (citation omitted).

"Next, the defendant must articulate a legitimate, non-discriminatory reason for the challenged employment action." *Sims*, 704 F.3d at 1332; *see also Liebman*, 2015 WL 9259224, at *3 ("Once an employee has established a *prima facie* case, the burden shifts to the employer to rebut the presumption of discrimination with evidence of a legitimate, nondiscriminatory reason for the adverse employment action.") (citation and internal quotation marks omitted). "If the defendant articulates one or more such reasons, the plaintiff is afforded an opportunity to show that the employer's stated reason is a pretext for discrimination." *Sims*, 704 F.3d at 1332; *see also Liebman*, 2015 WL 9259224, at *3 ("If the employer proffers a legitimate, nondiscriminatory reason, the burden shifts back to the employee to show that the employer's reason is a pretext."). As noted *supra*, *Gross* confirms that an ADEA plaintiff at all times bears

the burden of persuasion to show that age was the "but-for" cause of the challenged personnel action.[15]

**B.      *Application of Test / Pretext Analysis.***

The summary judgment analysis in this case, as in so many employment discrimination actions, turns on the question of pretext.  To be sure, the parties spar in their briefs over whether Bailey has or has not established a *prima facie* case of age discrimination.  This Court concludes that she has done so.[16]  Even if Bailey had not, however, the final result would be unchanged;

---

[15]      In applying the *McDonnell Douglas* framework, the Court remains mindful of the caveat that "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  "Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.*  Thus, *Smith* teaches that "no matter its form, so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper." *Id.*

[16]      The Board's position centers on the *prima facie* element that "a substantially younger person filled the position that she sought or from which she was discharged." *Kragor*, 702 F.3d at 1308.  Bailey was replaced by a 54-year old nurse, and the six-year age differential appears inadequate to qualify as "substantially younger."  Nonetheless, "[t]he methods of presenting a *prima facie* case are flexible and depend on the particular situation." *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010); *Bell v. Crowne Management, LLC*, 844 F. Supp.2d 1222, 1233 (S.D. Ala. 2012) ("the Eleventh Circuit has repeatedly emphasized that the requisite showings that make up a *prima facie* case are not meant to be rigid or inflexible") (citation and internal quotation marks omitted).  It is thus proper for Bailey, in developing her *prima facie* case, to rely on the Board's differential treatment of the much-younger Johnson relative to the treatment of Bailey for the same incident.  The Board protests that Johnson was not similarly situated to Bailey because they had different roles on the bus, there was different evidence to incriminate them and their conduct was different.  Certainly, it is correct that the Eleventh Circuit requires "that the quantity and quality of the comparator's misconduct be nearly identical" in discriminatory discipline cases. *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (internal quotations omitted).  Here, however, the evidence is that both Johnson and Bailey sat on a small school bus within several feet of where a special-needs student was assaulted, and that both failed to take preventive or corrective action, yet only Bailey was fired.  That scenario qualifies as circumstantial evidence of age-related discrimination, sufficient to satisfy Bailey's modest, flexible *prima facie* burden.  *See, e.g., Young v. United Parcel Service, Inc.*, --- U.S. ----, 135 S.Ct. 1338, 1354, 191 L.Ed.2d 279 (2015) ("The burden of making this showing is not onerous. … Neither does it require the plaintiff to show that those whom the employer favored and those whom the employer disfavored were similar in all but the protected ways.") (citations and internal quotation marks (Continued)

therefore, little purpose would be served by belaboring the minutiae of the parties' respective arguments as to plaintiff's *prima facie* case.  Likewise, the Board has plainly proffered a legitimate nondiscriminatory reason for terminating Bailey's employment, to-wit: That she was discharged for misconduct on the school bus on January 28, 2013.  Indeed, the letter prepared by Dr. Lee to explain his termination recommendation recites as grounds for that decision "neglect of duty, failure to perform your duties in a satisfactory manner, and other good and just cause," all stemming from the January 28 incident.  (Doc. 37, Exh. A-1.)  Notwithstanding plaintiff's strained argument to the contrary, such a showing is plainly sufficient to satisfy the Board's exceedingly light intermediate burden of production in the *McDonnell Douglas* test.[17]

In order to withstand the Motion for Summary Judgment, then, Bailey must establish pretext.  "The plaintiff can show pretext either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Kragor*, 702 F.3d at 1308 (citation and internal quotation marks omitted).  Where, as here, the plaintiff utilizes the latter approach, "[t]he district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997).  "When a plaintiff chooses to attack the veracity of the employer's proffered reason, the inquiry is limited to whether the employer gave an honest explanation of its behavior."  *Kragor*, 702 F.3d at 1310-11 (citation and internal marks omitted).  In that regard, "a plaintiff cannot recast the reason but must meet it head on and rebut it. … Quarreling with that reason is not sufficient."  *Wilson*, 376

---

omitted).  Defendant's explanations for differences in its treatment of Bailey and Johnson are appropriately examined through the lens of pretext.

[17]    *See, e.g., Vessels v. Atlanta Independent School System*, 408 F.3d 763, 769-70 (11th Cir. 2005) (employer's burden of production is satisfied if employer articulates clear and reasonably specific non-discriminatory basis for challenged decision); *Page v. Winn-Dixie Montgomery, Inc.*, 702 F. Supp.2d 1334, 1349 (S.D. Ala. 2010) ("This burden of production is exceedingly light.").

F.3d at 1088 (citation omitted).[18]  "A plaintiff showing that the employer was simply incorrect in its decision is insufficient: if the employer honestly believed that the employee engaged in misconduct, even if it was mistaken in such a belief, no discrimination exists."  *Perry v. Batesville Casket Co.*, 551 Fed.Appx. 987, 990 (11th Cir. Jan. 8, 2014).

The centerpiece of plaintiff's pretext argument concerns the Board's differential treatment of the 60-year old Bailey (who was fired) and the 33-year old Johnson (who was reprimanded and removed from the bus, but not fired).  According to plaintiff, the Board's "inconsistent approach between Bailey and Johnson fails to follow a logical discipline thread. The disparity between the two suggests the discipline against Bailey is nothing more than a sham."  (Doc. 45, at 10.)  The trouble with plaintiff's assertion is that it ignores the Board's clear, consistent, and logical explanation for why Bailey and Johnson were disciplined differently.  This explanation has three prongs.  First, the Board viewed Bailey and Johnson as having "fundamentally different" responsibilities on the bus.  While Johnson's primary duty was to operate the bus safely, Bailey was a passive rider charged with monitoring the medical needs of her assigned student.  (Lee Aff., ¶ 7.)  Thus, Bailey had a much greater capacity to observe and prevent student-on-student fisticuffs because, unlike Johnson, she was unencumbered by responsibilities of operating a large motor vehicle in potentially heavy/dangerous traffic conditions.  Second, the Board deemed the video to be compelling evidence of glaring misconduct by Bailey (and Jordan, for that matter).  By contrast, Johnson was neither visible nor audible in the video at the crucial juncture, such that no comparably severe misconduct on her part was recorded therein.  Thus, the Board deemed the video evidence against Bailey far stronger than that against Johnson.  (*Id.*)  Third, the Board placed particular weight on its conclusion (from viewing the video) that Bailey had intentionally turned her head, giving Student 1 tacit permission and carte blanche to assault Student 2 with no adult involvement;

---

[18]      *See also Chapman*, 229 F.3d at 1030 ("Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."); *Tobar v. Federal Defenders Middle Dist. of Georgia, Inc.*, 618 Fed.Appx. 982, 986 (11th Cir. July 8, 2015) ("[w]e have been clear that an employee cannot succeed in establishing pretext by simply quarreling with the wisdom of the employer's proffered reason") (citations and internal marks omitted).

however, the Board had absolutely no indication that Johnson had knowingly averted her gaze while one student on her bus attacked another.  (*Id.*)[19]

For purposes of an ADEA pretext analysis, the question is not whether the Court would have disciplined Bailey and Johnson the same way, nor is it whether the Court agrees with the Board's decision.  *See, e.g., Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (explaining that a plaintiff cannot show pretext by "substitut[ing] his business judgment for that of the employer" and that federal courts "do not sit as a super-personnel department that reexamines an entity's business decision," but instead confine their inquiry "to whether the employer gave an honest explanation of its behavior") (citations omitted).  The Board's evidence is that the differential treatment of Bailey and Johnson had nothing to do with age, and everything to do with its reasonable, honest determination that they were not similarly culpable for the January 28 incident.  That determination is bolstered by evidence that Johnson's primary duty was driving the bus (not watching over students), that the video proof of Bailey's misconduct was much more compelling than that of Johnson, and that the nature of Bailey's misconduct was more severe than that of Johnson.  Plaintiff has identified no weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the Board's account that might support a reasonable inference of pretext (*i.e.*, that the Board was lying about its reasons for firing Bailey, and that age discrimination was the real reason).[20]  Plaintiff may well think that

---

[19]    Plaintiff lambastes the Board's conclusion that Bailey had intentionally turned her head as "pure conjecture" supported by nothing "other than the decision makers [*sic*] subjective beliefs." (Doc. 45, at 9.)  Plaintiff is wrong.  On its face, the subject video recording supports a reasonable, non-conjectural inference that Bailey intentionally turned her head so that Student 1 could assault Student 2.  During the termination hearing, Bailey conceded that it "does look like that." (Doc. 37, Exh. A-2, at 108.)  In her summary judgment affidavit, Bailey "admit[s] it looks like I turned around at Student 1's direction." (Bailey Aff., ¶ 21.)  This is not a case in which decision makers ginned up misconduct charges out of thin air by fabricating events that never happened.  There was a video here, showing exactly what Bailey did and did not do.  Any rational viewer would conclude from the video, as Bailey herself repeatedly admits, that Bailey appeared to actively turn her head to allow Student 1 to hit Student 2.  As such, plaintiff's rhetoric that the Board's conclusion is the product of untethered imagination or "pure conjecture" grounded in insubstantial "subjective beliefs" is manifestly inaccurate.

[20]    In arguing otherwise, plaintiff insists that the Board's reasoning is merely that "*we just didn't have enough proof against Johnson* and they believed that Bailey was guilty." (Doc. 45, at 7.)  This is neither an accurate nor a fair characterization of the Board's explanation.  Plaintiff's accompanying detour into the admissibility of "I believe" statements (doc. 45, at 7 (Continued)

Johnson was more culpable than Bailey in the January 28 incident. But she has presented no evidence that might support a determination that it was inconsistent, incoherent, implausible or contradictory for the Board to announce that it had reached precisely the opposite conclusion based on the available materials, including particularly the video.

Plaintiff goes on to advance numerous other theories of pretext. For starters, plaintiff posits that the Board has been inconsistent in sometimes ascribing Bailey's work performance history as a reason for the termination decision, but other times denying it. (Doc. 45, at 12.) If it

---

n.4) is similarly unavailing. Dr. Lee does not simply state in conclusory fashion, "I believe Penny Bailey intentionally turned her head to allow one student to assault another." Had he done so, plaintiff's authorities might be on point. Instead, Dr. Lee sets forth the conclusions of his investigation and the evidence and reasoning upon which they rest. This is far different in substance and effect from a bald "I believe" statement. There are no evidentiary obstacles to the Board's ability to present evidence of what facts its investigation revealed and what reasonable conclusions its decisionmakers drew from such facts.

Elsewhere in her brief, plaintiff improperly quarrels with the wisdom of the Board's decision to discipline Bailey and Johnson differently. Plaintiff says Bailey had "no assigned supervisory responsibilities over any child in the bus excluding her assigned charge." (Doc. 45, at 7.) Even accepting that statement as true, such a lack of "assigned supervisory responsibilities" would not excuse Bailey's act of intentionally looking away (effectively making her complicit in Student 1's assault of Student 2) or absolve her from any duty to look after the safety and welfare of school children on the bus. Plaintiff balks that Johnson had "assigned and direct responsibilities to supervise children assigned on her bus" (*id.* at 8), but there is no evidence that Johnson knowingly looked away as Bailey did to facilitate student-on-student violence. Nor does plaintiff rebut the Board's evidence that Johnson's primary responsibility was to operate the bus safely, or that the video depicts Bailey's conduct at the crucial moment without showing anything about what Johnson was doing (other than driving the bus) at that moment. Plaintiff balks that Johnson's "participation and knowledge of the threat was confirmed by Jordan" (doc. 45, at 8-9, 15-16); however, the record citation given repeatedly by plaintiff for this proposition is a page of notes reflecting that Jordan said, "No, I didn't hear that" when asked if Student 1 had asked the bus driver for permission to hit Student 2. (Doc. 46, Exh. 23, at 1480.) The notetaker, Jennifer Sinclair, testified in her deposition on this very point as follows: "Q: [Jordan] says no, I did not hear [Student 1] ask driver? A: Right." (Sinclair Dep., at 120-21.) Thus, plaintiff's cited evidence emphatically does not support the proposition for which she cites it (namely, Johnson's awareness of impending violence on her bus). Plaintiff has simply not made a sufficient showing that the Board's stated reasons for firing Bailey were pretext, and that the real reasons for that decision were ageism, based on disparities in the discipline meted out to Bailey and Johnson. Again, the Board has extensively explained its reasons for those differences in treatment, and plaintiff has not met her burden of showing that a reasonable fact finder could deem these explanations to be a lie, an elaborate cover-up to mask illegal age-based animus.

existed, such an inconsistency might give rise to an inference of pretext.  However, plaintiff cites no evidence that the Board decision makers ever wavered or equivocated on the reasons for Bailey's dismissal.  Dr. Lee's termination letter references the January 28 incident, and the January 28 incident alone, as the reason for his termination recommendation, with no mention of other performance issues.  (Doc. 46, Exh. 18.)  In discovery in this litigation, plaintiff propounded as Interrogatory #2 the following: "Please describe in detail reasons for Plaintiff's termination."  Defendant's complete response was, "See notice of proposed termination located within Plaintiff's personnel file," which again was confined to the January 28 incident.  (*See* Doc. 46, Exh. 3, at 3.)  In his affidavit in this case, Dr. Lee identified as the sole reasons for his termination recommendation facts and conclusions relating to the January 28 incident.  (*See* Lee Aff., ¶ 4.)  Plaintiff does not point to a single exhibit, deposition or hearing transcript in which Dr. Lee or the Board ever stated that Bailey was fired because of a history of performance issues. As defendant succinctly puts it in its reply brief, "At no time has the Board shifted or changed its rationale as to why it terminated Plaintiff – her termination was recommended because of what is depicted in the video."  (Doc. 49, at 9.)  This pretext argument is unfounded.[21]

Next, plaintiff criticizes what she calls "Defendant's attempt to use after-acquired evidence" to justify its termination decision.  (Doc. 45, at 14.)  On this point, plaintiff relies on both evidence of Bailey's past performance and evidence about the relative dangerousness of the bus route, neither of which Dr. Lee had in hand when he made his recommendation.  This argument fails to demonstrate pretext because (i) the Board has never cited past performance evidence as the basis for its decision to terminate Bailey's employment; and (ii) while Dr. Lee mentioned the bus route during the termination hearing, he did so only in passing and only after

---

[21]   To be sure, plaintiff repeatedly points out (doc. 45, at 12, 14) that the Board's lawyers recited unflattering aspects of Bailey's performance history in defendant's principal summary judgment brief, as well as in correspondence to the EEOC.  (*See* doc. 39, at 10-12; doc. 46, Exh. 34, at 4; doc. 46, Exh. 35, at 2-3.)  However, plaintiff identifies no excerpt of those filings – or any other exhibit or record – in which the Board ever represented that Bailey's history of performance issues in the Baldwin County public school system was the reason for her discharge.  The Board explains that it included facts concerning Bailey's performance history in those filings to provide context for the termination decision, not to advance additional reasons for that decision.  (*See* doc. 49, at 9-10.)  In short, there is no inconsistency in the Board's filings that might give rise to an inference of pretext on the basis of shifting explanations for the challenged decision.

making the more general, common-sense point that (regardless of route) the bus driver's primary responsibility is to drive the bus safely, not to watch the children's every move.[22]

Plaintiff also seeks to make a showing of pretext by disputing defendant's assessment that "the video did not show the bus driver and her culpability was unclear." (Lee Aff., ¶ 7.) According to plaintiff, this is pretextual because the video demonstrates that "Student 1 specifically inquired of Johnson about whether or not he could hit student 2." (Doc. 45, at 15.) To be sure, the video reflects that Student 1 is sitting at the front of the bus, apparently near Johnson, and that they sometimes converse, although much of their dialogue is garbled. The video also reflects Student 1 asking, "I can do it? I can do it for real?" in the seconds before he gets out of his seat and punches Student 2 in the face. Plaintiff interprets this segment as meaning that Student 1 asked Johnson for permission to hit Student 2, rendering Johnson's culpability at least as great as Bailey's. Unfortunately for plaintiff, the video does not reveal any response by Johnson to these questions. Where is the evidence that Johnson heard (much less gave explicit or tacit approval for Student 1 to follow through on) his threat? Plaintiff cites none, and the Board's conclusion that there was none is reasonable under the circumstances.[23] After

---

[22]     Dr. Lee's actual testimony was as follows: "And on a typical bus, what you will find is that that driver has two responsibilities: They have the responsibility of watching the road and driving safely, and they also have the dual responsibility of glancing in the mirror to see if behavior is occurring that shouldn't be. … But when you have a small bus like that with three adults, I would not expect the bus driver to be observing the children." (Doc. 46, Exh. 27 at 31-32.) Defendant's decision not to fire Johnson is fully supported by the foregoing reasoning, without regard to Dr. Lee's later remarks that "[t]he route that they were on is potentially dangerous." (*Id.* at 32.) Considering this statement in context, principles of after-acquired evidence simply do not come into play here because the termination recommendation stands independently of any such information that Dr. Lee learned after the fact.

[23]     Plaintiff says it "was understood during the investigation" that Student 1 had asked if he could hit Student 2. (Doc. 45, at 15.) Of course, the "I can do it?" comments are captured on the recording, but it cannot be determined from the video whether Johnson heard, acknowledged or responded to them in any way. Plaintiff's citations to the record for this proposition are not to the contrary. For that reason, plaintiff's pretext argument breaks down. It was not unreasonable, inconsistent or incoherent for the Board to conclude that the video does not reveal the sort of clear misconduct by Johnson that it does by Bailey. Based on this determination, it was entirely consistent for the Board to frame its letter of reprimand to Johnson in terms of what she "should have been able to hear and see," rather than what she actually saw and heard (which, again, was indeterminate from the video and from the Board's ensuing investigation). (Doc. 46, Exh. 25.)

all, the video shows no nod of the head, acknowledgement, gesture or sign by Johnson; to the contrary, she is not even visible in the footage.  The audio portion of the recording picks up no response of any kind by Johnson to Student 1's questions.  During the investigation, Johnson denied hearing what Student 1 said or witnessing the assault of Student 2.  (Lee Aff., ¶ 7.)  It was neither unreasonable nor evidence of pretext for the Board to decide, under all the facts and circumstances, that Johnson's conduct (which was unclear and uncertain) did not warrant termination while Bailey's conduct (which, again, is conclusively depicted on the video to reflect her turning around 180 degrees instantly on Student 1's directive so that he could punch Student 2) did.

Plaintiff's remaining four pretext arguments may be quickly dispatched.  First, plaintiff identifies purported inconsistencies or inadequacies in the testimony of Bailey's supervisor, Linda Jones, regarding Bailey's past performance and disciplinary history.  (Doc. 45, at 17-20.)  As previously discussed, however, the Board never proffered Bailey's work history as an independent reason for her discharge; therefore, whether Jones described that history accurately or consistently is inconsequential to the task at hand.  Second, plaintiff says it was pretextual for the Board to cite Bailey's failure to perform a medical assessment of Student 2 after he was punched as a reason for termination.  Third, plaintiff says it was pretextual for the Board to cite Bailey's failure to report the incident as a reason for termination.  These arguments amount to mere quarreling with the wisdom of the Board's determinations that she should have medically assessed Student 2 and reported the incident, which is improper.  *See Alvarez*, 610 F.3d at 1266 ("The question to be resolved is not the wisdom or accuracy of Heidi's conclusion that Alvarez's performance was unsatisfactory, or whether the decision to fire her was 'prudent or fair.'").  More fundamentally, such arguments do not bolster plaintiff's cause on summary judgment because "[w]here the defendant articulates multiple, reasonable, legitimate and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons."  *Ennis v. Tyson Foods, Inc.*, 12 F. Supp.3d 1364, 1377 (N.D. Ala. 2014) (citing *Chapman*, 229 F.3d at 1024-25).  Plaintiff has not rebutted the Board's proffered reasons that she was fired for failing to respond properly to Student 1's threat and (especially) for intentionally turning away while Student 1 punched Student 2; therefore, establishing pretext in the Board's other proffered explanations would not alter the summary judgment analysis.  Fourth, plaintiff suggests that pretext may be inferred from the Board's position that Johnson was not fired because Dr. Lee

"did not receive a recommendation to terminate Johnson" (Doc. 45, at 21-22), even though Bailey was fired despite Dr. Lee likewise receiving no termination recommendation from her supervisors.  This assertion distorts and misstates defendant's position, and therefore cannot be credited.[24]

## IV.   Conclusion.

For all of the foregoing reasons, the Court finds that Bailey has failed, as a matter of law, to meet her burden of demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the Board's stated legitimate nondiscriminatory reasons for terminating her employment that a reasonable factfinder could deem them unworthy of credence. Without an adequate showing of pretext, Bailey's age discrimination claims against the Board cannot survive.  The Board possessed powerful video evidence that Bailey knowingly, intentionally turned her head while a special-needs student on her bus sitting just a few feet away from her was punched in the face by another student.  While Bailey protests that the video is not what it seems to be, it was not unreasonable for the Board to find that such compelling video evidence warranted the termination of Bailey's employment as depicting her complicity in a student assault.  Moreover, Bailey's attempt to build an ADEA cause of action because the substantially younger bus driver was not fired falls short because the Board reasonably determined that (i) the bus driver's role on the bus differed from Bailey's, (ii) the video evidence was nowhere near as strong against the bus driver, and (iii) Bailey intentionally allowed a special-needs student tethered to his seat to be attacked by another student, whereas the bus driver did not engage in comparable misconduct.

Plaintiff may disagree with the Board's conclusions.  Those conclusions may be unfair or flat-out wrong.  It may all have been, as Bailey says, an unfortunate coincidence that she turned

---

[24]      Plaintiff appears to be arguing that defendant is being dishonest in saying that Dr. Lee could not fire Johnson without a recommendation from her immediate supervisors.  But this is a straw man: Defendant says no such thing.  Defendant's summary judgment brief clearly states that "Dr. Lee could have made a recommendation to terminate the bus driver if he felt it was warranted based on the video evidence."  (Doc. 39, at 14 ¶ 55.)  Contrary to plaintiff's argument, defendant has never taken the position that Dr. Lee was powerless to commence termination procedures for Johnson without a prior recommendation from the Transportation Department.  Plaintiff misstates or misunderstands defendant's point as to recommendations.  In short, no pretext may be found in the fact that Bailey's supervisors did not recommend her termination.

her head at the precise moment when Student 1 signaled and directed her to do so before striking Student 2.  In the words of Buffy the Vampire Slayer, however, "there are two things I don't believe in: coincidences and leprechauns."  The ADEA does not obligate employers to believe in coincidences, either.  The Board's rejection of Bailey's "coincidence" explanation for her misconduct captured on video cannot support a reasonable inference that Bailey's age was the but-for cause of the Board's decision to fire her, particularly where the video displayed no comparable misconduct by the would-be comparator.  Accordingly, defendant's Motion for Summary Judgment (doc. 36) is **granted**, and the Complaint is **dismissed with prejudice**.  A separate judgment will enter.

      DONE and ORDERED this 6th day of January, 2016.

s/ WILLIAM H. STEELE<br>
CHIEF UNITED STATES DISTRICT JUDGE